Slip Op. 12-120

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| HOME MERIDIAN INTERNATIONAL, INC. D/B/A SAMUEL LAWRENCE FURNITURE CO. and IMPORT SERVICES, INC., | |
| Plaintiffs, | |
| GREAT RICH (HK) ENTERPRISES CO., LTD., DONGGUAN LIAOBUSHANGDUN HUADA FURNITURE FACTORY, NANHAI BAIYI WOODWORK CO., LTD., and DALIAN HUAFENG FURNITURE GROUP CO., LTD., | |
| Consolidated Plaintiffs, | **Before: Jane A. Restani, Judge** |
| v. | **Consol. Court No. 11-00325** |
| UNITED STATES, | **Public Version** |
| Defendant, | |
| AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR LEGAL TRADE  and VAUGHAN-BASSETT FURNITURE COMPANY, INC., | |
| Intervenor Defendants. | |

## OPINION AND ORDER

[In anti-dumping duty matter Plaintiffs' and Consolidated Plaintiffs' motion for judgment on the agency record granted.  Nanhai Baiyi Woodwork Co., Ltd.'s motion for judgment on the agency record granted.  Dalian Huafeng Furniture Group Co., Ltd.'s motion for judgment on the agency record granted.  Intervenor Defendants' motion for judgment on the agency record granted in part and denied in part.]

Dated: September 19, 2012

     Kristin H. Mowry, Mowry & Grimson, PLLC, of Washington, DC, argued for the plaintiffs and for the consolidated plaintiffs, Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory.  With her on brief were Jeffrey S. Grimson, Jill A. Cramer, Keith F. Huffman, Sarah M. Wyss, and Susan L. Brooks.

     Ned H. Marshak, Bruce M. Mitchell, and Mark E. Pardo, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, for the consolidated plaintiff, Nanhai Baiyi Woodwork Co., Ltd.

     Lizbeth R. Levinson and Ronald M. Wisla, Kutak Rock LLP, of Washington, DC, for the consolidated plaintiff Dalian Huafeng Furniture Group Co., Ltd.

     Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Carrie A. Dunsmore, Trial Attorney.  Of counsel on the brief was Shana Hofstetter, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, of Washington, DC.

     J. Michael Taylor, King & Spalding, LLP, of Washington, DC, argued for intervenor defendants.  With him on the brief were Daniel L. Schneiderman, Joseph W. Dorn, Mark T. Wasden, Prentiss L. Smith, and Sarah K. Davis.

     Restani, Judge: This action challenges the Department of Commerce's ("Commerce") final results rendered in the fifth antidumping ("AD") duty review of certain wooden bedroom furniture ("WBF") from the People's Republic of China ("PRC").  See Wooden Bedroom Furniture from the People's Republic of China: Final Results and Final Rescission in Part, 76 Fed. Reg. 49,729, 49,729 (Dep't Commerce Aug. 11, 2011) ("Final Results").  Plaintiffs Home Meridian International, Inc. and Import Services, Inc. along with consolidated plaintiffs Great Rich (HK) Enterprises Co., Ltd. and Dongguan Liaobushangdun Huada Furniture Factory (collectively "HMI") moved for judgment on the agency record.  Mot. for J. Upon the Agency R. Pursuant to Rule 56.2 by Pls. Home Meridian Int'l, Inc. d/b/a Samuel

Lawrence Furniture Co. & Pulaski Furniture Co. & Import Svcs., Inc. & Consol. Pl. Great Rich

(HK) Enterprises Co., Ltd. & Dongguan Liaobushangdun Huada Furniture Factory ("HMI Br.").

Consolidated Plaintiffs Nanhai Baiyi Woodwork Co., Ltd. ("Nanhai Baiyi") and Dalian Huafeng

Furniture Group Co., Ltd. ("Huafeng") each moved for judgment on the agency record.  Mem. of

Points and Auths. in Supp. of Consol. Pl. Dalian Huafeng Furniture Group Co., Ltd.'s 56.2 Mot.

for J. on the Agency R. ("Huafeng Br."); Mot. of Pl. Nanhai Baiyi Woodwork, Co. Ltd. for J. on

the Agency R. Under USCIT Rule 56.2 ("Nanhai Baiyi Br.").  HMI adopted the arguments made

by Huafeng.  HMI Br. 33.  Intervenor Defendants American Furniture Manufacturers Committee

for Legal Trade and Vaughan-Bassett Furniture Company, Inc. (collectively "AFMC"), which

were plaintiffs in one of the consolidated actions, also moved for judgment on the agency record.

AFMC's Rule 56.2 Br. in Supp. of its Mot. for J. on the Agency R. ("AFMC Br.").  For the

reasons stated below, the court remands in part and sustains in part the <u>Final Results</u>.

## BACKGROUND

In January 2005, Commerce published an AD duty order on WBF from the PRC.

<u>Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty</u>

<u>Order: Wooden Bedroom Furniture From the People's Republic of China</u>, 70 Fed. Reg. 329, 329

(Dep't Commerce Jan. 4, 2005).  In January 2010, AFMC and others requested an administrative

review of certain companies exporting WBF to the United States between January 1, 2009 and

December 31, 2009, thereby triggering the fifth administrative review of WBF.[1]  <u>Wooden</u>

---

[1] The subject merchandise includes the following items:

(1) Wooden beds such as loft beds, bunk beds, and other beds; (2) wooden headboards for
(continued...)

Bedroom Furniture From the People's Republic of China: Preliminary Results of Antidumping

Duty Administrative Review and Intent To Rescind Review in Part, 76 Fed. Reg. 7534, 7535

(Dep't Commerce Feb. 10, 2011) ("Preliminary Results").  After publishing a notice of initiation

and receiving questionnaire responses and comments, Commerce selected one mandatory

respondent: Huafeng.[2]  Id. at 7535.  In November and December 2010, Commerce verified the

---

[1](...continued)
beds (whether stand-alone or attached to side rails), wooden footboards for beds, wooden
side rails for beds, and wooden canopies for beds; (3) night tables, night stands, dressers,
commodes, bureaus, mule chests, gentlemen's chests, bachelor's chests, lingerie chests,
wardrobes, vanities, chessers, chifforobes, and wardrobe-type cabinets; (4) dressers with
framed glass mirrors that are attached to, incorporated in, sit on, or hang over the dresser;
(5) chests-on-chests, highboys, lowboys, chests of drawers, chests, door chests,
chiffoniers, hutches, and armoires; (6) desks, computer stands, filing cabinets, book
cases, or writing tables that are attached to or incorporated in the subject merchandise;
and (7) other bedroom furniture consistent with the above list.

The scope of the order excludes the following items: (1) Seats, chairs, benches, couches,
sofas, sofa beds, stools, and other seating furniture; (2) mattresses, mattress supports
(including box springs), infant cribs, water beds, and futon frames; (3) office furniture,
such as desks, stand-up desks, computer cabinets, filing cabinets, credenzas, and
bookcases; (4) dining room or kitchen furniture such as dining tables, chairs, servers,
sideboards, buffets, corner cabinets, china cabinets, and china hutches; (5) other
non-bedroom furniture, such as television cabinets, cocktail tables, end tables, occasional
tables, wall systems, book cases, and entertainment systems; (6) bedroom furniture made
primarily of wicker, cane, osier, bamboo or rattan; (7) side rails for beds made of metal if
sold separately from the headboard and footboard; (8) bedroom furniture in which
bentwood parts predominate; (9) jewelry armories; (10) cheval mirrors; (11) certain metal
parts; (12) mirrors that do not attach to, incorporate in, sit on, or hang over a dresser if
they are not designed and marketed to be sold in conjunction with a dresser as part of a
dresser-mirror set; (13) upholstered beds and (14) toy boxes.

Final Results, 76 Fed. Reg. at 49,730  31 (footnotes deleted).

[2] Commerce initially decided to review both Huafeng and the Dorbest Group.  All review
requests for the Dorbest Group were withdrawn.  Preliminary Results, 76 Fed. Reg. at 7535.
Commerce then named Dongguan Sunrise Furniture Co., Taicang Sunrise Wood Industry Co.,
                                                                    (continued...)

antidumping questionnaire and supplemental questionnaire responses of Huafeng.  Id. at 7536.

In the Final Results, Commerce assigned Huafeng a separate rate of 41.75%.[3]
Final Results, 76 Fed. Reg. at 49,733; see also Issues and Decision Memorandum for the Final

Results of the Administrative Review of the Antidumping Duty Order on Wooden Bedroom

Furniture from the People's Republic of China, A-570-890, POR 1/1/09 12/31/09 (Aug. 5, 2011)

("Issues and Decision Memorandum"), available at

http://ia.ita.doc.gov/frn/summary/prc/2011-20434-1.pdf (last visited Sept. 17, 2012).  All non-

mandatory respondents also received Huafeng's separate rate of 41.75%.  Final Results, 76 Fed.

Reg. at 49,733.  Commerce assigned the PRC-wide entity a rate of 216.01%.  Id.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will not

uphold Commerce's final determination in an AD review if it is "unsupported by substantial

evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

---

[2](...continued)
Ltd., and Huafeng Designs (collectively "Fairmont") as additional mandatory respondents.  Id. at
7535 36.  "[A] number of interested parties withdrew their review requests, including all review
requests of the mandatory respondent Fairmont."  Id.  Commerce rescinded the review with
respect to 119 entities, including Fairmont.  Id. at 7536.  The court has previously expressed its
view that the selection of one respondent does not fit well with the statutory scheme.  Obviously,
the all others rate does not reflect a broadly based average.  Here, no party challenges the
selection of one respondent as unsupported by the record or per se contrary to law.

[3] Commerce amended the Final Results, but did not change the assigned dumping
margins.  Wooden Bedroom Furniture From the People's Republic of China: Amended Final
Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 57,713, 57,713 (Dep't
Commerce Sept. 16, 2011).

## DISCUSSION

### I.      Value of Lumber, Veneer and Plywood[4]

Huafeng and HMI argue that Commerce erred when it used Philippine import data contemporaneous with the period of review ("POR") instead of Huafeng's market economy purchases in order to value lumber, veneer, and plywood.  HMI Br. 8; Huafeng Br. 8  28.  The Government contends that Commerce's determination was proper because Huafeng's market economy purchases were not made during the POR and therefore not the "best available information."  Def.'s Resp. to Pls.' Rule 56.2 Mots. ("Def. Resp. Br.") 23.  Specifically, the Government argues that Commerce, in exercising its discretion to interpret its regulations, "has developed a practice, whenever possible, of using price data that are contemporaneous with the period of review . . . ."  Def. Resp. Br. 23.  Huafeng and HMI's claim has merit.

In determining normal value for non-market economies, Commerce must use "the best available information . . . ."  19 U.S.C. § 1677b(c)(1)(B).  When valuing factors purchased from a market economy supplier, Commerce's regulations stipulate that:

> [T]he Secretary normally will use the price paid to the market economy supplier. In those instances where a portion of the factor is purchased from a market

---

[4] A dumping margin is the difference between the normal value ("NV") of merchandise and the price for sale in the United States.  See 19 U.S.C. § 1673e(a)(1); 19 U.S.C. § 1677(35). For merchandise exported from a non-market economy ("NME"), such as the PRC, Commerce calculates NV "on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  The factors of production include, but are not limited to, labor hours, raw materials, energy and other utilities, and representative capital cost, including depreciation.  Id. § 1677b(c)(3).  Surrogate values from market economy countries are often used as a measure of these costs.  See id. § 1677b(c)(1),(4); GPX Int'l Tire Corp. v. United States, 715 F. Supp. 2d 1337, 1347 (CIT 2010), aff'd, 666 F.3d 732 (Fed. Cir. 2011), reh'g granted, 678 F.3d 1308 (Fed. Cir. 2012).

economy supplier and the remainder from a nonmarket economy supplier, the
Secretary normally will value the factor using the price paid to the market
economy supplier.

19 C.F.R. § 351.408(c)(1).  Furthermore, Commerce creates:

> . . . a rebuttable presumption that market economy input prices are the best
> available information for valuing an entire input when the total volume of the
> input purchased from all market economy sources during the period of
> investigation or review exceeds 33 percent of the total volume of the input
> purchased from all sources during the period.  In these cases, unless case-specific
> facts provide adequate grounds to rebut the Department's presumption, the
> Department will use the weighted-average market economy purchase price to
> value the entire input.

Antidumping Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages,

Duty Drawback; and Request for Comments, 71 Fed. Reg. 61,716, 61,717  18 (Dep't Commerce

Oct. 19, 2006) ("Antidumping Methodologies").[5]

Section § 1677b "sets forth procedures in an effort to determine margins 'as

---

[5] In the past, Commerce has favored contemporaneous surrogate values over non-
contemporaneous market economy purchases, but it has never addressed a situation where such
purchases were 100% of the actual inputs of the subject merchandise.  See Issues and Decision
Memorandum for the Final Determination in the Antidumping Duty Investigation of diamond
sawblades and Parts Thereof from the People's Republic of China, A-570-900 Investigation, at
75  76 (May 15, 2006), available at http://ia.ita.doc.gov/frn/summary/PRC/E6-7763-1.pdf (last
visited Sept. 17, 2012) (declining to use market economy purchases where such purchases were
made prior to the period of investigation);  Issues and Decision Memorandum for the Final
Results of Antidumping Investigation of Automotive Replacement Glass ("ARG") Windshield
from the People's Republic of China, A-570-867, Investigation, 7/1/00-12/31/00, at Cmt. 32
(Feb. 12, 2002), available at http://ia.ita.doc.gov/frn/summary/prc/02-3383-1.txt (last visited
Sept. 17, 2012) (rejecting market economy purchases because they were either insignificant or
outside the period of investigation); Issues and Decision Memorandum for the 2002-03
Antidumping Duty Administrative Review: Certain Hot-Rolled Carbon Steel Flat Products from
Romania, A-485-806, Admin. Rev. 2002/03, at 25 (June 6, 2005), available at
http://ia.ita.doc.gov/frn/summary/romania/E5-3067-1.pdf (last visited Sept. 17, 2012) (declining
to use pre-POR purchases as "a benchmark against which [to] measure the surrogate values in the
instant review's POR").  Commerce's determinations in those proceedings were never reviewed
by the court with regard to market economy purchases.

accurately as possible.'"  Lasko Metal Products, Inc. v. United States, 43 F.3d 1442, 1446 (Fed.

Cir. 1994) (quoting Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990))

(finding that Commerce may permissibly mix methodologies, using market purchases to value

some factors and surrogates to value others).  "Where we can determine that a NME producer's

input prices are market determined, accuracy, fairness, and predictability are enhanced by using

those prices.  Therefore, using surrogate values when market-based values are available would, in

fact, be contrary to the intent of the law."  Lasko, 43 F.3d at 1446 (quoting Oscillating Fans and

Ceiling Fans from the People's Republic of China, 56 Fed. Reg. 55,271, 55,275 (Dep't

Commerce Oct. 25, 1991)); see Shakeproof Assembly Components Div. of Ill. Tool Works, Inc.

v. United States, 268 F.3d 1376, 1379, 1383 (Fed. Cir. 2001) (agreeing with Commerce that "the

actual price paid for the imports constitutes the best available information . . . ."); Taian Ziyang

Food Co. v. United States, 783 F. Supp. 2d 1292, 1330 (CIT 2011) (finding that "product

specificity" takes precedence over contemporaneity).  But, Commerce also has an interest in

using values that are contemporaneous with the POR because Commerce must establish the

value of a factor of production for a specific time period in order to calculate the normal value of

imports within that time period as accurately as possible under 19 U.S.C. § 1677b(a)(1)(A).  See

Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 30 CIT 1173,

1177 (2006).

        The parties agree that Huafeng made no market economy purchases of lumber

during the POR.  Huafeng Br. 7.  Huafeng alleges that it purchased 100% of its pine, poplar,

birch, elm, and oak lumber as well as its oak veneer from a market economy supplier from

December 2007 to December 2008, immediately before the period of review which ran from

January 2009 to December 2009.  Resp. of Dalian Huafeng to the Dep't of Commerce

Antidumping Request for Information ("Huafeng Resp. to Request for Information") (July 12,

2010), P.R. 338, Mem. of Points and Auths. in Supp. of Rule 56.2 Mot. for J. on the Agency R.

by Pls. Home Meridian Int'l, Inc. d/b/a Samuel Lawrence Furniture Co. & Pulaski Furniture Co.

and Import Svcs., Inc. & Consol. Pl. Great Rich (HK) Enters. Co., Ltd. & Dongguan

Liaobushshangdun Huada Furniture Factory ("HMI App."), Tab 14, at 7, Ex. D-4.  For the first

time, at oral argument, AFMC and the Government contested Huafeng's allegations that 100% of

relevant wood input for the subject merchandise during the POR was from these market economy

purchases made during the prior calendar year.  In the Preliminary Results, Commerce "did not

consider market purchases made by Huafeng prior to the POR . . . ."  Preliminary Analysis

Memo. for Dalian Huafeng Furniture Group Co., Ltd. (Jan. 31, 2011), P.R. 472, App. to AFMC's

Rule 56.2 Br. in Supp. of Its Mot. for J. on the Agency R. ("AFMC App."), Tab 18, at 3.  In lieu

of Huafeng's market economy purchases, Commerce used 2009 Philippine import data.  Id.  In

the Final Results, Commerce relied upon its "practice of using, whenever possible, price data that

are contemporaneous with the period under consideration to value [Factors of Production] . . . ."

Issues and Decision Memorandum 49.  Commerce explained that it treats market economy

purchases the same as surrogate values: Adjusted pre-POR market economy purchases or

surrogate values are used to construct normal value "only when there are no acceptable

contemporaneous [surrogate values] on the record . . . ."  Id.  Commerce pointed to the statutory

directive that normal value "shall be the price . . . at a time reasonably corresponding to the time

of the sale used to determine the export price or constructed export price . . . ."  19 U.S.C.

§ 1677b(a)(1)(A).

If the only wood inputs into the subject merchandise were market economy inputs,

contemporaneity would not outweigh all other factors.  See Lasko, 43 F.3d at 1446; Shakeproof,

268 F.3d at 1382.  Commerce must look at the record.  If the administrative record does not

reveal whether market economy purchases were the only inputs for the relevant wood inputs, this

is one factor which Commerce may weigh.  Another factor is that the surrogate value data chosen

by Commerce have notable flaws: 1) Commerce's Philippine Harmonized Tariff Schedule

("HTS") subheadings 4407.10.90, 4407.99.90, and 4408.90.90[6] show a significant and

unexplained increase over the market economy purchases made during the immediate prior

calendar year,[7] and 2) HTS subheading 4407.90.90 is a basket category that includes lumber

other than the poplar, birch, and elm used by Huafeng.  Accuracy is important.  Using the actual

---

[6] Philippine HTS 4407.10.90 is "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm.      Coniferous Other[.]"  Letter from King & Spalding to Commerce re: Submission of Publicly Available Information to Value Factors of Production (Nov. 15, 2010), P.R. 435, Ex. 2, at 234.  Philippine HTS 4407.99.90 is "Wood sawn or chipped lengthwise, sliced or peeled, whether or not planed, sanded or end-jointed, of a thickness exceeding 6 mm.      Other:      Other[.]"  Id. at 236.  Philippine HTS 4408.90.90 is "Sheets for veneering (including those obtained by slicing laminated wood), for plywood or for other similar laminated wood and other wood, sawn lengthwise, sliced or peeled, whether or not planed, sanded, spliced or end-jointed, of a thickness not exceeding 6 mm.      Other      Other[.]"  Id. at 237.

[7] The surrogate value applied by Commerce increased the value of Huafeng's wood input by nearly [[     ]] over Huafeng's market economy purchases from 2008.  HMI Br. 20  21.  AFMC has offered possible causes for this increase, but none of these were mentioned by Commerce.  The AFMC's Resp. in Opp. to Pls.' Rule 56.2 Mots. for J. on the Agency R. ("AFMC Resp. Br.") 5 n.3.

*Confidential Data Deleted*

inputs, if available and where they yield reliable values, would seem to promote accuracy more than does using flawed surrogate values.

Here, Commerce did not examine Huafeng's market economy purchases and therefore made no factual determination as to whether the relevant wood inputs were from market economy purchases. Commerce also did not determine whether or not such purchases were reliable indications of normal value. Commerce did not weigh the merits of using slightly non-contemporaneous market economy purchases of actual inputs versus contemporaneous surrogate values. Instead, Commerce found that accuracy could be determined solely by examining whether or not the values were from the POR. In defense of this position, Commerce stated that "using POR and pre-POR values to calculate NV may introduce distortions." Issues and Decision Memorandum 49. Yet Commerce frequently uses non-POR values for a variety of reasons. See, e.g., infra § III(A). Where two data sets are equally accurate, Commerce may prefer the contemporaneous data set over the non-contemporaneous data set. See Shakeproof Assembly, 30 CIT at 1178 79 (finding that Commerce may prefer one surrogate value over another on the basis of contemporaneity). Commerce, however, never determined whether the two data sets were equally accurate because it explicitly declined to look at Huafeng's non-contemporaneous market economy purchases. Commerce cannot create a blanket rule that prevents it from comparing the merits of contemporaneous and non-contemporaneous data, and thereby prevents Commerce from determining the best available information.[8]

---

[8] Huafeng and HMI argue that Commerce's regulations mandate that Commerce use non-contemporaneous market economy purchases   where such purchases are the actual input for the subject merchandise   even when those purchases are outside the POR. Huafeng Br. 8  11; HMI

(continued...)

Because Commerce relied upon contemporaneity to the exclusion of all other factors and failed to make necessary factual findings, Commerce's interpretation is not in accordance with law.  The court remands this matter to Commerce to determine the wood input factor of production in accordance with the statutory or regulatory framework, as well as to make any necessary factual determinations.[9]

## II.     Surrogate Value of Poly Foam

AFMC argues that Commerce's decision to value poly foam as a non-cellular plastic imported under the Philippine HTS heading 3920, rather than as a cellular plastic imported under HTS heading 3921, is unsupported by substantial evidence.  AFMC Br. 11.  AFMC's argument has merit.

---

[8](...continued)
Br. 16 18.  Commerce did not address the probity of Huafeng's market economy purchases.  Issues and Decision Memorandum 51.  Additionally, Commerce's verification of Huafeng's questionnaire responses is insufficient for the court to conclude that Commerce determined that Huafeng's market economy purchases were the actual input for the subject merchandise.  See Verification at Dalian Huafeng Furniture Group Co., Ltd. ("Huafeng Verification"), P.R. 474 (Jan. 31, 2011), HMI App., Tab 16, at 35.  On remand, Commerce will have the opportunity to complete its factual determinations.  Thus, the court does not resolve HMI and Huafeng's claim that the statute and regulations mandate that Commerce accept their non-contemporaneous market economy purchases.

[9]  HMI argues that Commerce erred in failing to correct a ministerial error when Commerce converted the surrogate value of plywood from a volume-based price to a unit-based price.  HMI Br. 30 33.  Because the court remands the issue of the value of plywood to Commerce on the aforementioned grounds, the court need not reach the issue of whether this was a ministerial error.  Commerce, however, should not perpetuate an error if it exists and if it continues to use the affected data.
    HMI also argues that Commerce should consider inflating Huafeng's 2008 market economy purchases to 2009 levels.  HMI Br. 14 15.  Commerce did not consider this issue because it did not examine Huafeng's market economy purchases.  Commerce may address both issues on remand to the extent they are relevant.

        Huafeng describes its poly foam as "packing material to protect goods in the

containers."  Huafeng Resp. to Request for Information, AFMC App., Tab 6, at Ex. D-5. [10]

Initially, Huafeng classified its poly foam under HTS subheading 3904.10.00, "Poly(vinyl

chloride), not mixed with any other substances[.]"[11]  Asean Harmonized Tariff Nomenclature

(AHTN) Book, 2010 Nomenclature ("AHTN Book"), Ch. 25 40, at 39.20 39.21, available at

http://www.tariffcommission.gov.ph/AHTN Chapter39.pdf (last visited Sept. 17, 2012); AFMC

Br. 5.  In response to Commerce's critique that Huafeng's suggested classification was likely

incorrect, Huafeng changed its categorization of poly foam to HTS subheading 3920.30.90, non-

cellular "polymers of styrene."[12]  Resp. of Dalian Huafeng to the Dep't of Commerce's Sept. 21,

2010 Supplemental Questionnaire ("First Supplemental Resp.") (October 12, 2010), P.R. 391,

HMI App., Tab 15, at 4 5; see also AHTN Book at 39.20 39.21.  Commerce asked Huafeng to

explain its selection of HTS subheading 3920.30.90.  Resp. of Dalian Huafeng to Questions 43-

72 of the Dep't of Commerce's Oct. 25, 2010 Supplemental Questionnaire ("Second

Supplemental Resp.") (Nov. 8, 2010), P.R. 429, HMI App., Tab 17, at 2 3.  Huafeng responded

that the "[p]oly foam reported by Dalian Huafeng consists of polyethylene, the composition of

---

        [10] The parties have placed the information discussed in this section in their public briefs
and appendices, despite their extensive use of the confidential administrative record.  No party
has objected.  The court treats information placed on the public record as public.

        [11] Philippine HTS subheading 3904.10.00 does not exist, but HTS subheading 3904.10
fits Huafeng's description.  HTS subheading 3904.10 consists of "Polymers of vinyl chloride or
of other halogenated olefins, in primary forms     Poly(vinyl chloride), not mixed with any other
substances[.]"  AHTN Book at 3904.10.

        [12] Philippine HTS 3920.30.90 reads in full: "Other plates, sheets, film, foil and strip, of
plastics, non-cellular and not reinforced, laminated, supported or similarly combined with other
materials     Of polymers of stryene     Other[.]"  AHTN Book at 39.20 39.21.

which is shown on the [Value Added Tax ("VAT")] invoice issued by the supplier."[13] Id. at 3.

Confused,[14] Commerce asked a follow up question:

> Philippine HTS 3920.20 contains non-cellular polymers of propylene.  Does your
> poly foam consist primarily of non-cellular polymers of propylene?  As stated in
> the previous response, Non-cellular poly vinyl chloride packing materials appear
> to be classified within HTS 3920.4x.xx.  Please suggest an alternate HTS if
> necessary.

Id.[15]  In response, Huafeng changed its categorization again and responded that "[p]oly foam

reported by Dalian Huafeng consists of polythene, which should be classified under Philippine

HTS 3920.10[.]90."  Id.  In the Final Results, Commerce classified poly foam as polyethylene,

------

[13] The VAT invoice submitted by Huafeng showed [[
        ]] Second Supplemental Resp., C.R. 157, at Ex. S-96.  "Polyethylene" is "a polymer
of ethylene," especially "one of a group of partially crystalline lightweight thermoplastics" with
particular chemical and physical characteristics.  Polyethylene, Webster's Third New Int'l
Dictionary, Unabridged, Merriam-Webster (2002), available at
http://unabridged.merriam-webster.com/ (last visited Sept. 17, 2012).  "Polythene" is
polyethylene used as a plastic.  Polythene, Webster's Third New Int'l Dictionary, Unabridged,
Merriam-Webster (2002), available at http://unabridged.merriam-webster.com/ (last visited Sept.
17, 2012).

[14] Commerce seems to have misread Huafeng's first response to mean Huafeng
categorized poly foam under HTS subheading 3920.20.90, non-cellular "polymers of propylene."
The error derived from Commerce's questionnaires, where inquiries regarding poly foam were
alongside questions regarding Huafeng's other packing materials, including packing tape.  See
First Supplemental Resp., P.R. 391, HMI App., Tab 15, at 4 5; Second Supplemental Resp., P.R.
429, HMI App., Tab 17, at 2 3.  Huafeng chose HTS subheading 3920.20.90, polymers of
propylene, for its packing tape.  First Supplemental Resp., P.R. 391, HMI App., Tab 15, at 5; see
also Second Supplemental Resp., P.R. 429, HMI App., Tab 17, at 3.

[15] "HTS 3920.4x.xx" refers to merchandise under HTS heading 3920 "Other plates,
sheets, film, foil and strip, of plastics, non-cellular and not reinforced, laminated, supported or
similarly combined with other materials.    Of polymers of vinyl chloride[.]"  AHTN Book at
39.20 39.21.

*Confidential Data Deleted*

under HTS subheading 3920.10.90.  Issues and Decision Memorandum 17.  Commerce found

that Huafeng had twice classified its poly foam as a non-cellular plastic under HTS heading

3920.  Id.  Commerce determined that, "Petitioners have cited to nothing on the record

contradicting Huafeng's consistent statements that its poly foam should be classified under HTS

categories for products consisting of non-cellular plastic."  Id.

        Commerce's determination relied entirely on Huafeng's "consistency" in

classification.  Custom and Border Protection ("CBP") Ruling NY J81106, stating that plastic

foam is cellular polyethylene and should be classified under HTS subheading 3921.19, calls that

classification into question.  AFMC's Post Preliminary Results Surrogate Value Submission

(March 7, 2011), P.R. 489, AFMC App., Tab 20, at Attach. 13.  Additionally, the World

Customs Organization ("WCO") Explanatory Notes state that cellular plastics include foam

plastics.  Id. at Attach. 14, VII 39 12.  These sources support the common definition of foam in

the industrial context: Foam is a "material in a lightweight cellular spongy or rigid form

produced by foaming," such as "expanded plastic."  Foam, Webster's Third New Int'l

Dictionary, Unabridged, Merriam-Webster (2002) (emphasis added), available at

http://unabridged.merriam-webster.com/ (last visited Sept. 17, 2012).[16]  Huafeng has not disputed

these characterizations of poly foam in its briefs and did not appear at oral argument to answer

any questions on this issue.  HMI also did not brief the issue or respond to questions at oral

argument on this issue.  Given the evidence on the record, Commerce must do more than refer to

_____

        [16] AFMC makes this argument based on an older dictionary definition of foam as "a
material in a lightweight cellular form resulting from introduction of gas bubbles during
manufacture."  AFMC Br. 11 (citing Webster's New Collegiate Dictionary, G. & C. Merriam Co.
(1977), available at http://www.merriam-webster.com/dictionary/foam).

the inconsistent statements of a respondent to unseat conventional wisdom.  Although Huafeng

twice chose an HTS subheading which was non-cellular, Huafeng has offered three different

classifications in response to Commerce's three requests for information.[17]  Huafeng's answers

were consistently unresponsive to Commerce's questions and in tension with a CBP Ruling and

the WCO Explanatory Notes.

      The Government counters that "Huafeng's responses are more specific to their

own input than general dictionary definitions . . . ."  Def. Resp. Br. 22.  Despite Commerce's

requests for Huafeng to explain its classification, no record evidence supports the Government's

conclusion.[18]  Additionally, Commerce's dismissal of the CBP Ruling on the basis that "the poly

foam under consideration was cellular and thus [inapplicable] to Huafeng's non-cellular poly

foam" fails to address AFMC's core point: Poly foam is necessarily cellular.  Issues and Decision

Memorandum 17.  Commerce also did not address the WCO Explanatory Notes.  Id.  Thus, other

than Huafeng's inconsistent responses, Commerce has provided no basis to believe that poly

foam is ever non-cellular.

      In the light of overwhelming evidence that poly foam is cellular, Huafeng's word

alone does not constitute substantial evidence that its poly foam is non-cellular.  Thus,

---

[17] Commerce's verification required an examination of Huafeng's poly foam.  Despite the back-and-forth between Huafeng and Commerce pre-dating verification, that portion of the verification report does not address poly foam.  Huafeng Verification, P.R. 474, HMI App., Tab 16, at 40 41.

[18] On brief, the Government alternates between stating that Commerce valued poly foam under HTS subheading 3920.30.90 and under 3920.10.90.  See Def. Resp. Br. 20, 21.  The court treats all these references as HTS subheading 3920.10.90 because this was Commerce's final determination.  See Issues and Decision Memorandum 17.

Commerce's determination to value poly foam under HTS heading 3920 is unsupported by

substantial evidence.  The court remands the issue to Commerce so that it can apply the correct

HTS subheading and derive the appropriate value therefrom.[19]

## III.    Surrogate Value of Labor

### A.    Contemporaneity of Data & Selection of Bookend Countries

AFMC argues that Commerce erred when it selected the bookend countries using

2008 gross national income ("GNI") data instead of 2009 GNI data.  AFMC Br. 22.  This claim

has merit.

In the methodology applied here Commerce selects bookend countries, two

countries with the highest and lowest GNIs of countries which are economically similar to the

PRC and produce comparable merchandise, in order to delineate the set of countries for wage

rate calculations.  Factor Valuation Memorandum (Jan. 31, 2011), App. to AFMC's Resp. Br. in

Opp'n to Pls.' Mots. for J. on the Agency R. ("AFMC Resp. App."), Tab 16, at Attach. III, 1.[20]

Here, Commerce identified the bookend countries from the Surrogate Country Memorandum's

list of economically comparable countries.[21]  Id.; Issues and Decision Memorandum 28.  At the

---

[19] AFMC proposes HTS subheading 3921.19, "Other plates, sheets, film, foil and strip, of plastics    Cellular    Of other plastics:    Plates and sheets forms[.]"  AFMC Br. 7.  The court expresses no opinion as to the merit of this classification.

[20] The Factor Valuation Memorandum was not placed on the administrative record. AFMC has put an excerpted version of the Factor Valuation Memorandum in its response appendix.  No party has objected to this version.

[21] When determining which countries are economically similar to China, Commerce uses per-capita GNI to identify countries at roughly the same level of economic development as China. Here, those countries were India, the Philippines, Indonesia, Ukraine, Thailand, and Peru.
(continued...)

time the Surrogate Country Memorandum was drafted, only 2008 GNI data were available.

Issues and Decision Memorandum 28  29.  In January 2011, when Commerce identified the

bookend countries, Commerce chose not to use 2009 GNI data which were also available.

Commere explained that "[t]he selection of bookend countries is inextricably linked to the 2008

GNI data that was available to the Department at the time the Surrogate Country Memorandum

was issued." Id. at 28  29.  Commerce added that "[t]o now reselect the bookend countries based

on 2009 data . . . would result in identifying one set of economically comparable countries as a

starting point for purposes of our initial surrogate country selection and a different, inconsistent,

set of economically comparable countries as a starting point for purposes of our labor rate

calculation." Id. at 29.

      Commerce has not explained what links the selection of possible surrogate

countries to the selection of the bookend countries for the purpose of wage rate calculations.

Additionally, Commerce explicitly excluded surrogate wage calculations from its Surrogate

Country Memorandum, P.R. 248, at 2, and considered the list of surrogate countries "non-

exhaustive." Id. at 1; Factor Valuation Memorandum, AFMC Resp. App. Tab 16, at Attach. III,

1, n.3; see Dorbest Ltd. v. United States, 755 F. Supp. 2d 1291, 1298 (CIT 2011) ("Dorbest V")

(finding that the surrogate country list was not exhaustive as it "allow[ed] for the possibility of

introducing a more balanced range of countries from which to draw labor wage rate data").

      Commerce did not "reselect" (nor would it have been required to "reselect") the

---

[21](...continued)
Request for a List of Surrogate Countries for an Administrative Review of the Antidumping Duty
Order on Wooden Bedroom Furniture from the People's Republic of China ("Surrogate Country
Memorandum") (Apr. 26, 2010), P.R. 248, at 2.

bookend countries, as it claims, Def. Resp. Br. 29, because selection of bookend countries took

place after the 2009 GNI data were available.  Furthermore, Commerce has identified no impact

from selecting bookend countries that differ from those listed in the Surrogate Valuation

Memorandum.  See Dorbest V, 755 F. Supp. 2d at 1298 ("[T]here is no indication here that the

methodology applied in Fujian Lianfu Forestry to select a primary surrogate country is similar to

the methodology for determining surrogate wage rates.  [Fujian Lianfu Forestry Co., Ltd. v.

United States, 638 F. Supp. 2d 1325, 1348  49 (CIT 2009).]").  Finally, as the prior wood input

discussion indicates, Commerce clearly places a high value on using data within the POR.  See

supra § I; Def. Resp. Br. 23  27; Issues and Decision Memorandum 49.  Here it has ignored the

fact that this is POR data.

        Commerce has insufficiently explained the connection between the selection of

surrogate countries and the selection of bookend countries.  Absent a new and persuasive

explanation, on these facts Commerce's decision to reject contemporaneous data in favor of non-

contemporaneous data is unreasonable.  The court remands the selection of bookend countries for

redetermination or further explanation.

### B.      Absolute/Relative Differences

        AFMC argues that Commerce erred when it used absolute differences in GNI

rather than relative differences when selecting the range of countries considered to be

economically comparable to China.  AFMC Br. 27.  AFMC concedes that the substantively

identical issue was before the court in Dongguan Sunrise.  Dongguan Sunrise Furniture Co., Ltd.

v. United States, Slip Op. 2012-79, 2012 WL 2045753, at *12 (CIT June 6, 2012); see AFMC Br.

28.  In Dongguan Sunrise, the court found that "[a]lthough AFMC has pointed out an alternative

method for determining which countries are economically comparable that would result in a

more preferable rate for AFMC, it has not shown that Commerce's methodology or the use of

absolute differences is unreasonable or unsupported."  Dongguan Sunrise, 2012 WL 2045753, at

*12.  Here, Commerce used the same methodology and explained itself in essentially the same

manner.  See Issues and Decision Memorandum 29.  AFMC's current arguments add nothing.

The court agrees with the reasoning of Dongguan Sunrise and sustains this aspect of the

determination.

**IV.      Financial Statements**

      AFMC argues that Commerce should rely on the financial statements of Kirsten,

Inc. ("Kirsten") and Cancio Associates, Inc. ("Cancio") to establish surrogate financial ratios

because Commerce erred in finding that they had significant retail operations.  AFMC Br. 18, 20.

AFMC also argues that Commerce should not rely on the financial statement of Insular Rattan

and Native Products Corp. ("Insular Rattan") because the financial statement does not include a

line item for taxes, which is necessary to determine whether the company received tax subsidies.

AFMC Br. 7  8.  AFMC's argument with regard to Insular Rattan has merit although its

arguments with regard to Kirsten and Cancio do not.

    **A.      Kirsten**

      AFMC argues that Commerce erred in excluding Kirsten's financial statements on

the basis that Kirsten engaged in "significant retail operations" and the examined respondent did

not.  AFMC Br. 20  22.  Specifically, AFMC argues that the absence of evidence in Kirsten's

financial statements and on Kirsten's website regarding significant retail operations casts

significant doubt on Commerce's claims that third-party websites demonstrate that Kirstin

engaged in significant retail operations.  Id. at 20‒21.

        Commerce determined that Kirsten may have significant retail operations based

on Kirsten's website, an online business directory entry for Kirsten, and photographs of the

outside of one of Kirsten's buildings.  Issues and Decision Memorandum 39.  Commerce found

that Kirsten's website indicated that it operated showrooms and served the local market through

an entity called "CASA MUEBLES SM."  Id.; AFMC's Post-Preliminary Results Surrogate

Value Submission (May 7, 2011), P.R. 489, AFMC App., Tab 20, at Attach. 1-B.  Commerce

paired Kirsten's address from an online business directory with an online picture of that address,

which appeared to be located in a shopping mall.  Issues and Decision Memorandum 39; Home

Meridian Rebuttal Surrogate Value Submission (Mar. 17, 2011), P.R. 500, AFMC App., Tab 21,

at Ex. 1.  AFMC argues that because Kirsten's financial statements do not reference the existence

of retail stores or operations, instead emphasizing manufacturing and exporting, Commerce's

determination lacks substantial evidence.  AFMC Br. 21.  Kirsten's website, however, clearly

states that the company has four showrooms.[22]  Commerce also noted that there were "multiple

_____

[22] Although, as AFMC notes, the portion of Kirsten's website indicating that they have
four showrooms was not put on the record, AFMC itself included significant other portions of the
same website on the record.  AFMC Br. 20; AFMC's Post-Preliminary Results Surrogate Value
Submission, P.R. 489, AFMC App., Tab 20, at Ex.1-B.  The website in its current form echoes
Commerce's factual findings.  Kirsten Int'l Inc.,
http://www.kirsten-intl.com/pages/showrooms.html (last visited Sept. 17, 2012).  Additional
information on the retail nature of this shopping mall exists.  Whether or not the court may take
judicial notice of public information readily accessible to all parties, there seems no purpose in
sending back this issue for Commerce to find what it has already found.  Regardless of further

                                                        (continued...)

useable financial statements" on the record from other companies for which there was no

indication of any retail activity.  Thus, sufficient data was available to calculate the necessary

financial ratios.  Issues and Decision Memorandum 39.  AFMC's contention relies on the

principle that the silence of Kirsten's financial statements on the existence of retail operations

disproves Commerce's interpretation of various websites.  Commerce permissibly interpreted the

record as evidence that Kirsten likely possessed significant retail operations.  Thus, Commerce's

determination that Kirsten's financial statements did not constitute the "best available

information" for calculating surrogate financial ratios was supported by substantial evidence.

###### B.    Cancio

AFMC argues that Commerce's exclusion of Cancio's financial statements, on the

basis that Cancio had retail operations, is unsupported by substantial evidence.  AFMC Br. 18.

Specifically, AFMC contends that Cancio's financial statement "conclusively contradicts"

Commerce's determination that the financial statements include the retail operations of CADI

Showrooms.  Id. at 19.

Commerce determined that expenses for CADI Showrooms were reflected in

Cancio's financial statements.  Issues and Decision Memorandum 43.  CADI Showrooms sells

Cancio's furniture and accessories to residential clients and is "managed by Cancio Associates."

Id.  CADI Showrooms has four main divisions: Cancio Contract, CADI Office Systems, CADI

Showrooms, and Cancio Export.  Id.; Home Meridian Rebuttal Surrogate Value Submission,

---

[22](...continued)
supportive facts external to the record, at this point the determination is sufficiently supported by
the record.

P.R. 500, AFMC App., Tab 21, at Ex. 5, 1  2.  Commerce interpreted this as evidence that the

entity CADI Showrooms was a retail division covered by the financial statement.  Issues and

Decision Memorandum 43.  Commerce supported this view with evidence of Cancio's outsized

administrative rental expense (which comprised 26% of selling, general, and administrative

("SG&A") expenses) and the fact that Cancio and CADI Showrooms shared the same office

address.  Id. at 43 & n.117.  Commerce also noted again that "there are multiple usable financial

statements on the record from other companies that do not have retail operations . . . ."  Id. at 43.

Accordingly, it found the volume and range of information that it used sufficient to derive the

necessary financial ratios, without Cancio's information.

        Commerce's decision that Cancio's financial statements did not provide the "best

available information" for calculating the financial ratios was reasonable based on the

information available on the record.  AFMC argues that a note in Cancio's financial statements

on revenue contradicts Commerce's determination.  AFMC Br. 19.  The note states that "[t]his

account consists of gross earnings on completed contracts amounting to P28,259,932 and

P46,561,119 as of December 31, 2009 and 2008, respectively."  AFMC's Post-Preliminary

Results Surrogate Value Submission, P.R. 489, AFMC App., Tab 20, Attach. 5-A, at 18.  AFMC

contends that this note indicates that Cancio's entire revenue was attributable to "completed

contracts" and therefore CADI Showrooms' revenue and expenses cannot be included in the

statements because retail sales cannot be contract sales.  AFMC Br. 19.  AFMC fails to explain

why the phrase "completed contracts" is applicable only to non-retail transactions.  Why cannot

retail sales also be contract sales?  Examples of contractual retail sales include credit card

transactions, lay-away purchases, and installment plans.  Additionally, "completed contract"

typically refers to the completed contract accounting method[23] and has no bearing on the

relationship between a subsidiary retail operation and its parent company.[24]  Thus, Commerce's

decision to exclude Cancio's financial statements has not been significantly undermined.

      **C.**      **Insular Rattan**

        AFMC argues that Commerce erred when it used the 2009 financial statements

from Insular Rattan when calculating the surrogate financial ratios for factory overhead, SG&A

expenses, and profit because Insular Rattan's financial statements fail to disclose the company's

tax expense, as required by the Philippine Accounting Standards.  AFMC Br. 7  8.  The parties

agree that the same argument was contested in Dongguan Sunrise.  AFMC Br. 17.  As in the

prior administrative review, Commerce defended its use of Insular Rattan's financial statements

on the basis that the statements were "affirmed by the auditor to be prepared in accordance with

the GAAP of the Philippines," Commerce "does not rely on income taxes in calculating financial

ratios" and the record contained no evidence that Insular Rattan had received subsidies.  Issues

and Decision Memorandum 38; see Issues and Decision Memorandum for the Final Results of

the Administrative Review of the Antidumping Duty Order on Wooden Bedroom Furniture from

---

    [23] Under the completed contract accounting method, any income/expense from a long-term contract is realized only in the year that the work on the contract is completed.  Spang Indus., Inc. v. United States, 791 F.2d 906, 907 (Fed. Cir. 1986).

    [24]AFMC is correct in noting that Commerce neglected to respond to the "completed contracts" portion of AFMC's argument in its decision.  AFMC Br. 19; AFMC Reply Br. in Supp. of Its Rule 56.2 Mot. for J. on the Agency R. ("AFMC Reply Br.") 4.  Contrary to AFMC's fears, however, the court does not rely on the Government's post-hoc rationalization in concluding that Commerce could exclude Cancio's financial statements. See id. at 4  5.

the People's Republic of China, A-570-890, POR 1/1/08  12/31/08, at 88 (Aug. 11, 2010),

available at http://ia.ita.doc.gov/frn/summary/PRC/2010  20499  1.pdf (last visited Sept. 17,

2012).  In Dongguan Sunrise, the court found Insular Rattan's financial statements were

potentially unreliable, but that "[w]ithout further information, the court cannot determine

whether Commerce has decided unreasonably to use a dubious financial statement."  Dongguan

Sunrise, 2012 WL 2045753, at *16.  Because the facts and arguments are identical, and the court

agrees with Dongguan Sunrise, the court remands for reconsideration of the use of this statement

or for an explanation as to why Commerce finds that Insular Rattan's financial statement is

generally reliable and also unaffected by subsidies.

V.    **Combination Rates**

          AFMC argues that Commerce abused its discretion by refusing to develop the

record with necessary information regarding circumvention in order to apply combination rates,

and instead by requiring AFMC to supply conclusive proof of circumvention.  AFMC Br. 29  32.

AFMC relies on CBP data in the form of two sets of entry documents with sequential numbering

from two different companies, and data that shows that the vast bulk of the entries were from the

company with the lower rate, to argue that Commerce cannot decline to investigate in light of

such prima facia evidence of circumvention.[25]  AFMC Br. 33  38.[26]  Because AFMC's evidence

---

[25] AFMC points to two entry numbers, [[

(continued...)

*Confidential Data Deleted*

is not "speculative", as claimed by Commerce, and there also appears to be issue with AD

circumvention with respect to WBF largely due to the large number of exporters involved and the

widely varying rates applicable to the exporters, Commerce must investigate and decide whether

combination rates are appropriate in the context of this subject merchandise.

It is a truism that "[t]he application of combination rates is left to the discretion of

Commerce." Dongguan Sunrise, 2012 WL 2045753, at *24 (citing 19 C.F.R. § 351.107(b)(1));

Tung Mung Dev. Co. v. United States, 354 F.3d 1371, 1381 (Fed. Cir. 2004).  As the court has

cautioned, however, "[a]n agency's failure to collect pertinent data . . . in some situations may

constitute an abuse of discretion."  Dongguan Sunrise, 2012 WL 2045753, at *24 (citing U.S.

Steel Grp. v. United States, 18 CIT 1190, 1202, 873 F. Supp. 673, 687 (1994), aff'd 96 F.3d 1352

(Fed. Cir. 1996)).

---

[25](...continued)

]] Proprietary Information
Relating to the July 11, 2011 Issues and Decision Memorandum (Aug. 5, 2011), C.R.
INT_021493, at 2  3.  This type of behavior is not speculative.

[26] AFMC has once again placed an article from Furniture Today on the record as evidence
that Commerce should have used combination rates.  AFMC Br. 28.  The court has repeatedly
rejected this article as insufficient proof to require Commerce to apply combination rates.  See
Dongguan Sunrise, 2012 WL 2045753, at *24; Lifestyle Enter., Inc. v. United States, 768 F.
Supp. 2d 1286, 1313  14 (CIT 2011).  Commerce may choose to consider the article as somewhat
supportive, even if it is insufficient by itself.

*Confidential Data Deleted*

Here, Commerce asserts that "the application of combination rates would be too large of an administrative burden to be practicable,"[27] the facts in the instant case do not match with the facts from a prior instance where Commerce imposed combination rates,[28] and "there is no record evidence concerning specific producer/exporters shifting their exports from high-margin to low-margin exporters."  Issues and Decision Memorandum 26.

These reasons are all unsupportive of Commerce's decision either because they are not explained or simply do not agree with the evidence of record.  Because Commerce failed to investigate clearly raised allegations as to the circumvention of AD law in this administrative review of WBF, which were supported by apparently reliable record evidence, Commerce abrogated its duty to ensure that exporters and producers do not circumvent AD law.  In Dongugan Sunrise, the court noted that:

> The broader issue is whether Commerce should in its short form questionnaire, which focuses on whether a respondent is to get a rate other than that of the

---

[27] Commerce's argument that applying combination rates would be a large administrative burden is irrelevant if Commerce's inaction permits circumvention of AD law in contravention of the AD statute.  See Lifestyle Enter., 768 F. Supp. 2d at 1314.  Also, Commerce has not explained precisely why this is such a burden.

[28] Commerce's duty to use combination rates or otherwise prevent circumvention of AD law has nothing to do with whether or not the facts of the instant case correspond with the facts in Pistachios from Iran.  See Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain In-Shell Raw Pistachios from Iran, A-507-502, ADR: 07/01/02-06/30/02 (Feb. 7, 2005) at 16, available at http://ia.ita.doc.gov/frn/summary/iran/E5-596-1.pdf (last visited Sept. 17, 2012); see also Import Administration Policy Bulletin 03.2: Combination Rates in New Shipper Reviews (Mar. 3, 2004), available at http://ia.ita.doc.gov/policy/bull03-2.html (last visited Sept. 17, 2012) (outlining the policies for implementation of combination rates where the system is being circumvented).  Furthermore, Commerce considered four factors in that review and it is unclear if Commerce considered these factors or otherwise investigated AFMC's allegations of circumvention.

> PRC-entity, ask about shipments of subject merchandise for or by another company.  Apparently this type of inquiry was included previously.  The court is concerned that Commerce's answer that it cannot act because it has no circumvention data and the fact that it does not ask for the data creates a familiar geometric object.  The court declines to order a new investigation here because AFMC's evidence of circumvention is largely based on its own client's general statements to a magazine.  This is a troubling area, however, and Commerce should be prepared to alter its investigation techniques or explain its actions carefully in the future.  It is also not a satisfactory answer that Commerce does attend to these problems in new shipper reviews.

Dongguan Sunrise, 2012 WL 2045753, at *25.  Commerce argues that this case is just like Dongguan Sunrise, but, in fact, the companies at issue were treated differently.  Unlike in Dongguan Sunrise, here Commerce did not apply the 216.01% PRC-wide rate to the company accused of routing other companies' sales through its low AD rate.[29]  Additionally, in Dongguan Sunrise, "Commerce examined and verified the sales of Nanjing Nanmu and determined that the sales were actually from Nanjing Nanmu."  Dongguan Sunrise, 2012 WL 2045753, at *24.  Commerce also found that the increase in Aosen's shipments through lower-rate companies could be attributed to legitimate business reasons.  Id.  Commerce made no such efforts or findings in the instant case except to state in a blanket manner that "in instances where companies may be improperly misreporting their entries to CBP, such instances will be reported to CBP for proper action under that agency's fraud provisions."  Issues and Decision Memorandum 26.  It is unclear whether Commerce in fact reported such instances CBP and, if they were reported, what actions were taken.

---

[29] [[

                                                    ]]

*Confidential Data Deleted*

Accusations and evidence of circumvention date back to the third administrative review of WBF, indicating an issue that seems particular to the subject merchandise at issue in the instant case.  Such behavior may be a byproduct of the complex network of hundreds of Chinese exporters and producers, which may necessitate greater investigation and oversight of WBF than other subject merchandise.  Because Commerce did not collect data relating to the circumvention of AD law or otherwise explain why such data were unnecessary in this case to prevent circumvention, Commerce likely abused its discretion to apply antidumping duty remedies itself.  Thus, the issue of combination rates is remanded to Commerce to investigate and decide whether combination rates are appropriate.

## VI.    Zeroing[30]

HMI asks the court to remand the issue of zeroing so that Commerce may comply with the Federal Circuit's holdings in <u>Dongbu Steel Co. v. United States</u>, 635 F.3d 1363, 1366 (Fed. Cir. 2011) and <u>JTEKT Corp. v. United States</u>, 642 F.3d 1378, 1383-84 (Fed. Cir. 2011); HMI Br. 23.  Because this issue was not raised in the brief at the agency level, the court first addresses administrative exhaustion before reaching the merits.

### A.    Administrative Exhaustion

The Government argues that the issue of zeroing should not be remanded because HMI failed to exhaust its administrative remedies.  Def. Resp. Br. 38.  HMI counters that invoking administrative remedies with respect to zeroing would have been futile and the court

---

[30] "Zeroing is the practice whereby the values of positive dumping margins are used in calculating the overall margin, but negative dumping margins are included in the sum of margins as zeroes." <u>JTEKT</u>, 642 F.3d. at 1383 (citing <u>Dongbu</u>, 635 F.3d at 1366).

therefore should excuse HMI's failure to exhaust administrative remedies.  HMI Br. 28  29.

   The court "shall, where appropriate, require the exhaustion of administrative

remedies." 28 U.S.C. § 2637(d).  Exhaustion may be waived in certain circumstances, including

where unexpected legal developments arise or a challenge to agency action would have appeared

futile.  Gerber Food (Yunnan) Co. v. United States, 601 F. Supp. 2d 1370, 1377 (CIT 2009)

(discussing situations where waiver of the exhaustion requirement is appropriate); see Budd Co.,

Wheel & Brake Div. v. United States, 15 CIT 446, 452, n.2, 773 F. Supp. 1549, 1555 n.2 (1991).

The futility exception requires a party to demonstrate that it would have been "required to go

through obviously useless motions in order to preserve [its] rights."  Corus Staal BV v. United

States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (quoting Walsh v. United States, 151 Ct. Cl. 507,

511 (1960)).

   The parties agree that HMI did not challenge Commerce's use of zeroing in

administrative reviews in its administrative case brief.  HMI Br. 23; Def. Resp. Br. 9.  Nine days

after HMI submitted its administrative case brief, the Federal Circuit announced a decision

requiring Commerce to explain or abandon its inconsistent use of zeroing in administrative

reviews but not in investigations.  See Dongbu, 635 F.3d at 1373; HMI Br. 25  26; Def. Resp. Br.

9.  Following Dongbu, HMI attempted to raise the issue of zeroing on two occasions before

Commerce issued its final results.  See infra n. 30.

   "Both Dongbu and JTEKT came as a surprise to many because a long-line of

cases seemed to allow Commerce great discretion in making the [zeroing] calculation at issue."

Union Steel v. United States, 823 F. Supp. 2d 1346, 1348 (CIT 2012), appeal docketed, Appeal

No. 2012-1248 (Fed. Cir. 2012).  Considering the numerous past decisions affirming

Commerce's use of zeroing in administrative reviews, see id. at 1350  52, HMI correctly believed

that challenging Commerce's use of zeroing would have been futile.  Moreover, the same day

that Dongbu was issued, HMI promptly sent a letter notifying Commerce of the recent decision

and indicated its intent to challenge the continued use of zeroing in administrative reviews.[31]

Thus, in the instant case, HMI's failure to exhaust administrative remedies with respect to

zeroing is excused due to 1) an unexpected legal development, 2) a challenge to Commerce's use

of zeroing in administrative reviews as a practical matter appeared futile prior to Dongbu, and 3)

HMI acted promptly in attempting to rectify its understandable failure to exhaust once Dongbu

was issued.

       The Government and AFMC's view that nothing prevented HMI from raising the

issue in its administrative case brief is too narrow on these facts.  See Def. Resp. Br. 41  42;

AFMC Resp. Br. 17.  Defendants argue that "[t]he mere fact that an adverse decision may have

been likely does not excuse a party from satisfying statutory or regulatory requirements to

exhaust administrative remedies."  Tianjin Magnesium Int'l Co. v. United States, 722 F. Supp.

2d 1322, 1330 (CIT 2010) (citations omitted); see also Def. Resp. Br. 42.  Defendants seem

---

[31] Plaintiffs sent notices of the intervening Federal Circuit decision to Commerce on March 31, 2011 (the same day Dongbu was published) and June 6, 2011.  See Letter from Arent Fox to Commerce re: Notice of Intervening CAFC Decision (June 6, 2011), P.R. 541; Letter from Commerce to Mowry & Grimson re: Untimely Written Argument in March 31, 2011, Letter (Apr. 5, 2011), P.R. Doc. 527, HMI App., Tab 12, at 1; see also HMI Br. 26.  Commerce rejected these submissions as untimely.  Letter from Commerce to Mowry & Grimson re: Untimely Written Argument in March 31, 2011, Letter (Apr. 5, 2011), P.R. Doc. 527, HMI App., Tab 12, at 1; Letter from Commerce to Arent Fox re: Untimely Written Argument in June 6, 2011, Letter (June 6, 2011), P.R. 542, HMI App., Tab 13, at 1; see also HMI Br. 25  26.

merely to argue that because a subsequent case questioned the validity of Commerce's zeroing, it

was not futile for HMI to make its argument to Commerce.  That the law seemed to change due

to a judicial opinion, however, is at the core of the recognized exceptions to the exhaustion

requirement.  Gerber Food, 601 F. Supp. 2d at 1377.  The Federal Circuit's decisions in Dongbu

and JTEKT made a challenge to Commerce's use of zeroing tenable, in so far as those decisions

required Commerce to provide an explanation for its differing use of zeroing in ongoing

administrative reviews but not in new investigations.[32]  Thus, for a variety of reasons HMI's

failure to exhaust administrative remedies with respect to zeroing is excused.

### B.      Commerce's Explanation

Having determined that the zeroing issue is properly before the court, HMI argues

that the issue should be remanded to Commerce to calculate Huafeng's dumping margin without

zeroing.  HMI Br. 24  25.  Dongbu, however, merely requires Commerce to provide a reasonable

justification for its inconsistent use of zeroing.[33]  Dongbu, 635 F.3d at 1373; see also JTEKT,

---

[32]  The Government and AFMC also argue that the court has already expressly rejected the
futility exception in a similar situation.  Fuwei Films (Shandong) Co. v. United States, 791 F.
Supp. 2d 1381, 1384  85 (CIT 2011); see also Def. Resp. Br. 42; AFMC Resp. Br. 16.  In Fuwei
Films, the plaintiff moved to amend its complaint to challenge Commerce's use of zeroing after
Dongbu was issued.  The court held that the futility exception was inapplicable because "[t]here
was nothing preventing Fuwei from asserting its rights at the administrative level."  Id. at 1385.
In Fuwei Films, the court noted that had plaintiffs asserted its rights with vigor by, for example,
submitting a letter to Commerce challenging the use of zeroing as "an unreasonable
interpretation of the dumping statute," Fuwei would have "created a record suitable for judicial
review."  Id.  In the present case, HMI promptly submitted two letters to Commerce, indicating
its intent to challenge Commerce's use of zeroing in the wake of Dongbu.  HMI Br. 25  26.  The
facts of the present case suggest waiver of exhaustion is not inappropriate here.

[33]  Several challenges to Commerce's continued use of zeroing in administrative reviews
have been stayed pending the Federal Circuit's decision in Union Steel (Fed. Cir. No. 2012-
(continued...)

642 F.3d at 1384 85 ("In order to satisfy the requirement set out in <u>Dongbu</u>, Commerce must

explain why . . . [it is] reasonable to continue zeroing in one phase, but not the other.").  Because

Commerce's use of zeroing was not challenged until after the briefing had concluded and

Commerce declined to accept "untimely" arguments, Commerce in this administrative review

provided no justification.  This is very similar to the situation in <u>Dongbu</u>.  As this matter is

remanded on other grounds, this issue is also remanded to Commerce to provide an explanation

for its differing use of zeroing in administrative reviews and investigations.

---

[33](...continued)
1248).  <u>See</u> <u>JTEKT Corp. v. United States</u>, Slip Op. 2012-72, 2012 WL 2000993 (CIT June 4,
2012); <u>JTEKT Corp. v. United States</u>, Slip Op. 2012-73, 2012 WL 2001379 (CIT June 4, 2012);
<u>NTN Bearing Corp. of Am. v. United States</u>, Slip Op. 2012-75, 2012 WL 1999645 (CIT June 4,
2012); <u>SKF USA Inc. v. United States</u>, Slip Op. 2012-74, 2012 WL 1999685 (CIT June 4, 2012);
<u>NSK Corp. v. United States</u>, Slip Op. 2012-76, 2012 WL 1999641 (CIT June 4, 2012); <u>NSK
Bearings Eur., Ltd. v. United States</u>, Slip Op. 2012-77, 2012 WL 2001745 (CIT June 4, 2012).
The court explained its rationale for granting stays on the zeroing issue:

> In summary, the pending litigation in the Court of Appeals is likely to affect the
> disposition of plaintiffs' claim challenging [Commerce's] zeroing practice.  While
> the case at bar concerns a different antidumping duty order and administrative
> review than are involved in <u>Union Steel</u>, both cases raise the same general issue of
> whether the Department's application of the zeroing methodology in an
> administrative review of an antidumping duty order is lawful.  A stay, therefore,
> will serve the interest of judicial economy and conserve the resources of the
> parties.  Moreover, defendant and defendant-intervenor have failed to show, or
> even allege, that the proposed stay would cause them harm.

<u>NSK Corp</u>, Slip Op. 2012-76, 2012 WL 1999641, at *1.  No party to this case has requested a
stay.  Moreover, several unrelated issues within this case are remanded.  Thus, the interests of
orderliness and judicial efficiency weigh in favor of granting a remand on the zeroing issue as
well.  In addition, later explanations, not present here, supporting zeroing in reviews have been
upheld.  <u>See</u> <u>Union Steel</u>, 823 F. Supp. 2d at 1346; <u>Far Eastern New Century Corp v. United
States.</u>, Slip Op. 2012-110, 2012 WL 3715105, at *2 (CIT Aug. 29, 2012); <u>Grobest & I-Mei
Indus. (Vietnam) Co. v. United States</u>, Slip Op. 2012-100, 2012 WL 3104900, at *6 (CIT July
31, 2012).

## VII.    Separate Rates of Other Respondents

AFMC argues that if Huafeng's separate-rate dumping margin is increased, Commerce should adjust the weighted-average separate-rate of the other respondents, which were calculated based on Huafeng's rate.  AFMC Br. 38.  The Government argues that only those respondents subject to an injunction of liquidation (Nanhai Baiyi,[34] Great Rich (HK) Enterprise Co., Ltd., Dongguan Liaobushangdun, and Huafeng) may have their rates adjusted based on any changes to Huafeng's rates.  Def. Resp. Br. 38; Pls. Home Meridian Int'l, Inc. d/b/a Samuel Lawrence Furniture Co. & Pulaski Furniture Co. & Import Svcs., Inc. & Consol. Pl. Great Rich (HK) Enterprises Co., Ltd. & Dongguan Liaobushangdun Huada Furniture Factory Reply Br. in Supp. of Rule 56.2 Mot. for J. upon the Agency R. 14.  The court agrees with the reasoning in Dongguan Sunrise that the Government's argument has merit.  Dongguan Sunrise, 2012 WL 2045753, at *25.  Pursuant to the statutory scheme the way to obtain a change in final assessment rates when a court decision is not in agreement with the Commerce determination is to have liquidation of relevant entries enjoined.  See 19 U.S.C. § 1673b(c), (e).  Domestic parties, just as respondents, may have liquidation of entries enjoined.  Zenith Radio Corp. v. United States, 710 F.2d 806, 811 12 (Fed. Cir. 1983).  Thus, AFMC could have preserved this relief.  AFMC has not sought this relief.  Accordingly, its request is denied.[35]

---

[34] Nanhai Baiyi argues that should Commerce recalculate Huafeng's rate, Commerce should also recalculate Nanhai Baiyi's dumping margin.  Nanhai Baiyi Br. 7 8.  No party claims otherwise.  Because Nanhai Baiyi was subject to suspension of liquidation, Commerce should recalculate Nanhai Baiyi's rate to reflect any changes to Huafeng's rate.

[35] What action Commerce may take on deposit rates when assessment rates are not

(continued...)

## CONCLUSION

For the foregoing reasons, the court remands the matter for Commerce to reconsider or explain whether a surrogate value or market economy purchases constitute the best available information for certain wood inputs, apply the correct HTS sub-heading for poly foam, reconsider or explain its reliance on 2008 GNI data for labor wage rate calculations, reconsider or explain why Insular Rattan's financial statement is generally reliable and usable, obtain the necessary information to decide whether combination rates are appropriate, and provide the required explanation of its zeroing practice.  If Commerce calculates a different separate rate for Huafeng, Commerce shall make appropriate adjustment for assessment purposes to the separate rates of the parties before the court in this litigation.  Commerce's determination is sustained in all other respects.

As further investigation is ordered, Commerce shall file its remand determination with the court within 120 days of this date.  The parties shall have 30 days thereafter to file objections, and the Government will have 15 days thereafter to file its response.

                                                  /s/ Jane A. Restani
                                                   Jane A. Restani
                                                       Judge

Dated: This 19th day of September, 2012
          New York, New York

---

[35](...continued)
changed is not an issue that has been briefed adequately before the court and the court expresses no opinion on it.